# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 22-134V

| | |
|---|---|
| NORMAN MICHAUD,<br><br>　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: January 30, 2025 |

*Anthony K. Ferguson, Fales & Fales, P.A.,* Lewiston, ME, for Petitioner.

*Rachelle Bishop, U.S. Department of Justice,* Washington, DC, for Respondent.[1]

### DECISION AWARDING DAMAGES[2]

On February 9, 2022, Norman Michaud filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[3] (the "Vaccine Act"). Petitioner alleges that he suffered Guillain-Barré syndrome ("GBS") resulting from an influenza ("flu") vaccine received on November 7, 2020. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. Although entitlement was conceded, the parties could not resolve damages, and

---

[1] Felicia Langel appeared for Respondent at the January 24, 2025 Motions Day hearing.

[2] When this Decision was originally filed, I advised my intent to post it on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), Petitioner filed a timely motion to redact certain information. This decision is being posted with Petitioner's name redacted to reflect his initials only. Except for those changes and this footnote, no other substantive changes have been made. This Decision will be posted on the court's website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc with no further opportunity to move for redaction.

[3] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

therefore the matter was determined at a "Motions Day" proceeding held on January 24, 2025.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$212,578.22, comprised of $138,000.00 for actual pain and suffering, $62,282.82 in lost earnings, and $11,295.40 in unreimbursable expenses.**

## I.   Relevant Procedural History

The case was activated on May 10, 2022 (ECF No. 11). Respondent conceded entitlement, and entitlement was found in Petitioner's favor on March 20, 2023. (ECF No. 30). However, the parties reached an impasse in their damages discussions and on September 26, 2023, Petitioner filed a motion for a ruling on the record addressing damages (ECF No. 40). Respondent filed his response on November 13, 2023 (ECF No. 41), and Petitioner replied on December 11, 2023. (ECF No. 42).

On January 3, 2025, the parties filed a joint status report confirming that they were amenable to an expedited hearing. The Motions Day hearing occurred as scheduled on January 24, 2025, and this written decision memorializes my oral ruling issued at the conclusion of the hearing.[4]

## II.   Relevant Factual Evidence

### A. Medical Records

Petitioner was fifty-eight years old and self-employed as a plumber at the time he received the subject vaccination on November 7, 2020. Petitioner's medical history is significant for hypertension, an enlarged prostate, obesity, bilateral knee pain, lower back pain, diverticulosis, urinary frequency and incontinence, stool incontinence, and transient complaints of numbness in his hands at night. Ex. 4 at, 1-7, 21-24. Petitioner received the subject flu vaccination from his primary care provider ("PCP"). Ex. 3.

On November 30, 2020, twenty-three days post-vaccination, Petitioner saw Dr. Jeffrey Wall at his PCP's office for complains of pain and numbness in his calves and numbness in his toes, indicating that the symptoms started approximately one week prior and approximately two weeks post vaccination. Ex. 4 at 27. He indicated he was having difficultly going up stairs and ladders and also had numbness in his fingers. *Id.* Dr. Wall

---

[4] That ruling will be set forth in the transcript from the hearing, which has not yet been filed but is fully incorporated into this Decision.

assessed Petitioner with bilateral calf pain most consistent with muscle strain, numbness of the toes likely from nerve compression in the feet, and carpal tunnel syndrome. *Id.* at 28.

Two days later on December 2, 2020, Petitioner returned to his PCP and was seen by nurse Amy Ouelette for increased numbness in his hands and feet. *Id.* at 32. Petitioner reported his symptoms were progressing and had bilateral leg weakness affecting his gait, requiring the use of a cane to walk. *Id.* He also reported poor balance and was unable to stand on his toes. *Id.* A physical examination revealed reduced motor strength and a rigid, ataxic gait, and Nurse Ouelette's impression was ataxia with concern that Petitioner had a spinal cord compression or lesion, and she ordered spinal imaging and a neurological consult. *Id.* The result of this MRI was evidence of degenerative disc disease but nothing which would explain progressing symptoms. Ex. 11, at 3.

Petitioner saw nurse Heather Carpenter on December 17, 2020, for a neurosurgical evaluation for a possible spinal compression or lesion. Ex. 13 at 1. She reviewed Petitioner's MRI results and told him that he did not have a spinal cord compression or lesion but expressed concern his symptoms could be explained by a motor neuron disease. *Id.* at 2. On December 18, 2020, Petitioner underwent a thoracic MRI which also did not reveal a spinal cord compression. Ex. 11.

On December 24, 2020, Petitioner saw Dr. Hunter Sweet, a neurologist. Petitioner reported the progression of his symptoms and that the sensory loss in his toes had progressed to his knees, and he had difficulty walking, requiring the use of a walker. Ex. 5 at 1. On examination, Petitioner had absent deep tendon reflexes in his bilateral upper and lower extremities, bilateral foot drop, and a wide-based gait, and was unable to stand up from a seated position without the use of his arms. *Id.* at 4. Dr. Sweet's assessment was acute inflammatory demyelinating polyneuropathy ("AIDP") or GBS, which he noted "may be secondary to influenza vaccination which occurred about 3.5 weeks prior to symptom onset." *Id.* Dr. Sweet ordered a lumbar puncture, additional labs, and an MRI of the cervical spine and the plan was for Petitioner to begin intravenous immunoglobulin ("IVIG") treatment once the lumbar puncture results returned. *Id.*

On December 28, 2020, Petitioner went to the emergency department of CMMC for hospital admission to undergo five founds of IVIG after his lumbar puncture results showed a mildly elevated cerebral spinal fluid protein level. Ex. 6 at 2-3. Due to the holiday season, Petitioner was unable to receive outpatient infusions, but he was not deemed admitted as an in-patient otherwise. Ex. 5 at 7. Petitioner remained at CMMC until December 31, 2020. After two days, he reported feeling better, was steadier on his feet, and was able to shower independently, and the following day his paresthesias had improved to where the sensation was limited to the fingertips. Ex. 6 at 20. While admitted,

3

lab results came back positive for neurosyphilis and although an infectious disease specialist noted that Petitioner had no obvious contributing history and his clinical presentation was not consistent with neurosyphilis, Petitioner was still placed on IV penicillin for ten days. *Id.* at 13-14. Petitioner was discharged to inpatient rehabilitation at CMMC on December 31, 2020. He remained in inpatient rehab to finish his IVIG and penicillin infusions before being discharged on January 6, 2021, with a rolling walker. *Id.* at 32-36; Ex. 7 at 2-10. Petitioner was told he could resume normal activities as he was able. *Id.* at 21-23.

On January 8, 2021, Petitioner saw Dr. Sweet for a neurological follow-up. He reported he still had some tingling in his arms when active with resolution upon rest, that he was able to walk inside his home without assistance, and he was able to go up stairs one at a time although he experienced "uncomfortable dysesthesias" when he put pressure on his feet. Ex. 5 at 7.

On January 22, 2021, Petitioner began physical therapy ("PT"). Ex. 8. Between January 22, 2021, and February 26, 2021, Petitioner attended ten PT sessions. *Id.* at 10-28. Petitioner changed PT providers on March 3, 2021, noting at an initial evaluation that his main issues were balance and a "spongey" feeling in his feet. Petitioner completed an additional 21 PT sessions between March 3, 2021, and June 2, 2021. Ex. 9 at 8-72.

On July 13, 2021, Petitioner saw Dr. Jagivan Mehta, a neurologist, for a six-month follow-up for his GBS. Ex. 5 at 12. Dr. Mehta noted that Petitioner had made a "dramatic recovery" and had returned to working approximately 20-30 hour work weeks. *Id.* Petitioner still complained of difficulty climbing stairs, paresthesias, and a "rubbery" feeling in the bottom of his feet. Dr. Mehta ordered an electromyography/nerve conduction study ("EMG/NCS") and advised Petitioner to follow-up in three months.

On August 31, 2021, Petitioner saw Dr. Cynthia Richards, a neurologist, for EMG/NCS testing. The study yielded abnormal results, showing electrodiagnostic evidence of AIDP. Ex. 5 at 16. Petitioner had an annual exam with his PCP on November 12, 2021, during which he reported that he had mostly recovered but still was not working full-time due to fatigue. Ex. 4 at 42.

Petitioner returned to Dr. Mehta on December 10, 2021, and was informed of the results of his EMG/NCS study. He continued to report residual paresthesias and the rubbery sensation in his feet, but no weakness and also noted his balance was better and he no longer required the use of a cane or walker to support ambulation. Ex. 5 at 22. Dr. Mehta advised Petitioner to continue with PT and use a cane when necessary because he had developed sensory ataxia from lost proprioception due to neuropathy. *Id.* at 25.

Petitioner underwent a noninvasive Rezum procedure for his enlarged prostate on June 17, 2022, with his PCP. At this time, it was noted that Petitioner still had some decreased sensation in his feet. Ex. 31.

### B. Declarations

Petitioner submitted two signed affidavits in support of his claim. Exs. 2, 35. The first affidavit, executed on February 9, 2022, and filed that same date along with his petition and medical records, speaks to the course of petitioner's GBS onset and symptoms. *See generally* Ex. 2.

The second affidavit, executed on September 26, 2023 and filed into the record that same day, recounts the impact of Petitioner's GBS on his daily life and employment. Petitioner recounts that prior to his GBS, he was almost always the sole employee of his plumbing and heating company. Ex. 35 ¶ 4. He describes how due to his GBS, he was unable to work from December 2020 to March 12, 2021, his first day back working. *Id.* ¶ 6. He further describes that his lingering GBS symptoms initially limited the number of hours he could work, and that for the summer of 2021 he had to hire an additional employee that he wouldn't have done in the absence of his GBS symptoms due to his difficulty in carrying tools and parts and carrying things up and down stairs. *Id.* ¶ 7. Petitioner notes that at some point in early 2022, he was able to return to work full-time with some limitations, such as having to turn down certain jobs due to the physicality of the work and being unable to work more than three consecutive days due to fatigue. *Id.* ¶¶ 8-9.

Describing the impact his GBS had on his personal life, Petitioner notes that between December 3, 2020, and January 23, 2021, he was unable to drive his car and had difficulty walking distances, and that such symptoms persist, to the point where he gets more fatigued during the day and finds it increasingly difficult to walk distances. *Id.* ¶¶ 10-11. He further describes how his girlfriend had to move into his house to care for him for most of December until his hospitalization, and how he was unable to care for his elderly father for December 2020 and January 2021. *Id.* ¶¶ 12, 14.

### III. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health &*

*Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[5] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

### IV.   The Parties' Arguments

The sole issue in dispute is determining an appropriate award for Petitioner's past pain and suffering damages. Petitioner requests $180,000.00, and in support cites the following cases: *Johnson v. Sec'y of Health & Hum. Servs.*, No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. Jul. 20, 2018) (awarding $180,000.00); *Dillenbeck v. Sec'y of Health & Hum. Servs.*, No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. Jul. 29, 2019) (awarding $170,000.00); *Devlin v. Sec'y of Health & Hum. Servs.*, No. 19-191V, 2020 WL 5512505 (Fed. Cl. Spec. Mstr. Aug. 7, 2020) (awarding $180,000.00); and *McCray v. Sec'y of Health & Hum. Servs.*, No. 19-277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug. 31, 2021) (awarding $180,000.00).

---

[5] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of GBS claims, were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

Petitioner argues that the instant case is similar to those offered as comparables, given common factors such as Petitioner's inability to work for several months, the necessity of hospitalization and inpatient rehabilitation and/or physical therapy, and on-going GBS sequelae that continue to affect Petitioner's daily living to this day. Mot. at 13.

Respondent has countered with $117,500.00 for pain and suffering. Respondent notes that Petitioner experienced a moderate course of GBS with a dramatic recovery; that Petitioner's hospitalization for IVIG treatment was limited, and reflected only the unavailability of outpatient treatment rather than the severity of his GBS at that time; and that Petitioner has not required ongoing medication or extensive other treatment to manage his lingering GBS symptoms. Resp. at 10-12. Respondent also argues that Petitioner relies upon cases are distinguishable, because those individuals all experienced a more severe form of GBS in some way (e.g., longer hospitalization, worse pain, and a longer recovery). *Id.* at 12. Respondent has offered the following cases as comparable to his proposed damages amount: *Sand v. Sec'y of Health & Hum. Servs.*, No. 19-1104V, 2021 WL 4704665 (Fed. Cl. Spec. Mstr. Aug. 31, 2021) (awarding $130,000.00); *Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 1482497 (Fed. Cl. Spec. Mstr. Mar. 30, 2022) (awarding $125,000.00); and *Shankar v. Sec'y of Health & Hum Servs.*, No. 19-138V, 2022 WL 2196407 (Fed. Cl. Spec. Mstr. May 5, 2022) (awarding $135,000.00).

### V. Appropriate Compensation in this Case

#### A. Pain and Suffering

In arriving at a pain and suffering award, I review the facts and circumstances of the petitioner before me, in the context of other cases and precedent. GBS is a particularly concerning and frightening condition, and the pain and suffering award should reflect that. Reasoned decisions, rather than cases resolved on proffer, provide the best comparable cases for arriving at an award when the parties are unable to resolve damages through negotiations. But ultimately the facts of the case at issue are the most significant factor.

Here, Mr. Michaud experienced a moderate case of GBS. Although he required hospitalization and inpatient rehabilitation, the stay was not as protracted as in more severe presentations of GBS, and involved largely IVIG treatment. Petitioner was prescribed gabapentin and Medrol Dosepak to manage his symptoms prior to his hospitalization, but the records indicate that he only required one course of each of these, with no prescription pain medication needed following the completion of his IVIG treatment. Petitioner also appears to have made a very good recovery – by February 2021 he was able to resume caring for his elderly father, by March 2021 he was able to return to working on a part-time basis, and by early 2022 he was able to resume working full-time, albeit with some modifications based on his lingering symptoms.

Compared to the cases cited to by Petitioner, the overall course of Petitioner's GBS was less severe. For example, the petitioner in *Dillenbeck* required 14 days of

7

hospitalization followed by six days of inpatient rehabilitation, plus live-in care from three adults for approximately five to six months thereafter. *Dillenbeck*, 2019 WL 4072069, at *2-4. Additionally, upon returning to work that petitioner was unable to perform the duties of her prior job and had to take a different, less physically taxing job that also had lower wages. *Id.* The *McCray* petitioner required 12 days of hospitalization followed by 21 days of inpatient rehabilitative care, and 31 days of home-based PT and OT services, along with the use of prescription pain medication following her hospitalization for severe neuropathic pain. *McCray*, 2021 WL 4618549, at *2. Additionally, the onset of Petitioner's symptoms in the instant case appears to have been more gradual, contrasted to the acute presentation of symptoms in these cases.

Respondent's cited cases prove to be more applicable in this case. All involve petitioners who required comparable periods of hospitalization and physical therapy, and who have largely been able to return to a level of activity close to what they experienced prior to the onset of their GBS. For example, in *Shankar* it was noted that approximately two months after vaccination, the petitioner had almost returned to her baseline function and cognitive status and her lingering symptoms were centered on muscular endurance and fatigue. *Shankar*, 2022 WL 2196407, at *2-3.

However, Respondent's proposed sum is not fully justified, even on the basis of better comparable cases. Indeed, as Respondent notes in his Response, "no reasoned decision is on par with an award of $117,500.00." Resp. at 15. Respondent attempts to justify this number nevertheless, arguing that the lack of required hospitalization is a compelling reason for a lower sum, as in *Sand*. *Id.* But the *Sand* petitioner received $130,000.00 in pain and suffering, more than Respondent proposes. Thus, there appears to be no strong reasoning for so low of an award when, as here, Petitioner *did* require some kind of hospitalization for treatment of his GBS, plus subsequent inpatient recovery.

Based upon the facts of this case and the reasoning contained in this decision as well as my oral ruling at the January 24, 2025, hearing, I find that Petitioner should be awarded $138,000.00 for his past pain and suffering.

### B. Unreimbursable Expenses and Lost Wages

The parties agree that Petitioner should be reimbursed $11,295.40 for past unreimbursed expenses, and $63,282.82 for lost wages. Mot. at 14; Resp. at 16.

### Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $138,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[6] **I also find that Petitioner**

---

[6] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-

**is entitled to $11,295.40 in actual unreimbursable expenses and $63,282.82 for lost wages.**

**I therefore award Petitioner a lump sum payment in the amount of $212,578.22 to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[7]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**

Brian H. Corcoran
Chief Special Master

---

0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[7] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.